SILLS CUMMIS & GROSS P.C.
Philip R. White
Thomas S. Novak
Scott B. Murray
Boris I. Mankovetskiy
One Riverfront Plaza
Newark, New Jersey  07102
(973) 643-7000
pwhite@sillscummis.com
tnovak@sillscummis.com
smurray@sillscummis.com
bmankovetskiy@sillscummis.com
*Attorneys for Plaintiff, Official Committee of Unsecured
Creditors of Bayonne Medical Center*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>BAYONNE MEDICAL CENTER,<br><br>Debtor. | Hon. Morris Stern<br><br>Case No. 07-15195 (MS)<br><br>Chapter 11 |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF BAYONNE MEDICAL CENTER,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT H. EVANS, HERMAN BROCKMAN, THEODORE GARELICK, WILLIAM J. CAMPBELL, ROBERT C. MILL, WILLIAM J. FINNERTY, HOWARD LEVINE, ANTHONY WARD, DEBORAH WOZNIAK and WITHUMSMITH+BROWN, P.C.,<br><br>Defendants. | Adv. Pro. No. 09- |

**ADVERSARY COMPLAINT**

Plaintiff, the Official Committee of Unsecured Creditors of Bayonne Medical Center (the

"Plaintiff"), by and through its attorneys, Sills Cummis & Gross P.C., by way of adversary

1

complaint against the defendants, Robert H. Evans ("Evans"), Herman Brockman ("Brockman"), Theodore Garelick ("Garelick"), William J. Campbell ("Campbell"), Robert C. Mill ("Mill"), William J. Finnerty ("Finnerty"), Howard Levine ("Levine"), Anthony Ward ("Ward"), Deborah Wozniak ("Wozniak"), and WithumSmith+Brown, P.C. ("WS+B") (collectively, the "Defendants"), states and alleges as follows:

## JURISDICTION

1.      This is an adversary proceeding seeking the entry of money judgments against the Defendants.

2.      This adversary proceeding arises in and relates to the above-captioned Chapter 11 case of Bayonne Medical Center, which case is now pending in this District.

3.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

4.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F) and (O).  To the extent that this matter is not a core proceeding, this Court has jurisdiction over this matter because it is related to the Chapter 11 case of Bayonne Medical Center.  The parties consent to the entry of final orders and judgments by this Court pursuant to 28 U.S.C. 158(c)(2).

5.      Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409.

## PARTIES

6.      At all times relevant to this Complaint, Bayonne Medical Center ("BMC" or "the Debtor") was a 278-bed acute care hospital providing community-based healthcare services in the City of Bayonne, New Jersey.

7.     On April 16, 2007 (the "Petition Date"), BMC filed in this Court a voluntary

petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy

Code").

8.     Defendant Robert H. Evans was the President and Chief Executive Officer of

BMC, a member of BMC's Board of Trustees (the "Board"), a member of the Board's Executive

Committee, and a member of the Board's Finance Committee and Audit & Compliance

Committee (the "Audit Committee") during the relevant time period of the allegations herein.

Upon information and belief, Evans resides at 52 Rockledge Road, Montville, NJ 07045.

9.     Defendant Herman Brockman was the Chairman of BMC's Board of Trustees and

the Chairman of the Board's Executive Committee during the relevant time period of the

allegations herein.  Upon information and belief, Brockman resides at 104 Lexington Avenue,

Bayonne, NJ 07002.

10.     Defendant Theodore Garelick was the Vice Chairman of BMC's Board of

Trustees and a member of the Board's Executive Committee, Finance Committee and Audit

Committee during the relevant time period of the allegations herein.  Upon information and

belief, Garelick resides at 31 Park View Terrace, Bayonne, NJ 07002.

11.     Defendant William J. Campbell was a member of BMC's Board of Trustees, the

Board's Treasurer, and a member of the Board's Executive Committee and Chair of the Board's

Finance Committee during the relevant time period of the allegations herein.  Upon information

and belief, Campbell resides at 63 West 39th Street, Apartment 404, Bayonne, NJ 07002.

12.     Defendant Robert C. Mill was a member of BMC's Board of Trustees, the

Board's Secretary, and a member of the Board's Executive Committee and Finance Committee

during the relevant time period of the allegations herein.  Upon information and belief, Mill

resides at 873 Village Green, Westfield, NJ 07090.

13.    Defendant William J. Finnerty was a member of BMC's Board of Trustees and a

member of the Board's Executive Committee and Finance Committee, and the Chairman of the

Board's Audit Committee during the relevant time period of the allegations herein.  Upon

information and belief, Finnerty resides at 28 West 50th Street, Bayonne, NJ 07002.

14.    Defendant Howard Levine was a member of BMC's Board of Trustees and a

member of the Board's Executive Committee and Finance Committee during the relevant time

period of the allegations herein.  Upon information and belief, Levine resides at 789 Avenue C,

Bayonne, NJ 07002.

15.    Defendant Anthony Ward was a member of BMC's Board of Trustees and a

member of the Board's Audit Committee during the relevant time period of the allegations

herein.  Upon information and belief, Ward resides at 1 East 1st Street, Bayonne, NJ 07002.

16.    Defendant Deborah Wozniak was a member of BMC's Board of Trustees and a

member of the Board's Audit Committee during the relevant time period of the allegations

herein.  Upon information and belief, Wozniak resides at 19 East 27th Street, Bayonne, NJ

07002.

17.    Defendant WithumSmith+Brown, P.C. is a New Jersey professional corporation

staffed with certified public accountants licensed to practice accounting in New Jersey.  In early

2006, WS+B performed an audit of the consolidated financial statements of BMC and its

affiliate, BMC Foundation, as of December 31, 2005, and issued an unqualified audit report

regarding the same.  At all times relevant to this complaint, WS+B maintained its principal place

of business at 5 Vaughn Drive, Princeton, New Jersey 08540.

4

18.    Defendants Brockman, Garelick, Campbell, Mill, Finnerty, Levine, Ward and Wozniak are hereafter referred to collectively as the Trustee Defendants.

19.    The Trustee Defendants, along with defendant Evans, are hereafter referred to collectively as the Trustee and Officer Defendants.

## PROCEDURAL HISTORY

20.    BMC continued to operate its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108 after the Petition Date.

21.    By order dated November 9, 2007, BMC sold substantially all of its assets to IJKG LLC and related entities.

22.    By Order dated March 25, 2009, the Bankruptcy Court approved a certain Stipulation and Order Conferring Standing and Directing that the Official Committee of Unsecured Creditors Shall Have the Authority to Bring and Pursue Certain Cause of Action Belonging to the Debtor's Estate (the "Standing Order").

23.    By Order dated April 9, 2009 (the "Confirmation Order"), the Bankruptcy Court confirmed the First Amended Joint Plan of Liquidation for Bayonne Medical Center.

24.    Pursuant to the Confirmation Order, the Committee, as an estate representative, retained the right and has standing to bring the causes of action set forth in this Complaint on behalf of BMC's estate.

25.    Pursuant to the Standing Order and the Confirmation Order, Plaintiff has the requisite standing and authority to commence this adversary proceeding.

## FACTUAL ALLEGATIONS

### A.    Summary of Allegations:

26.    Starting in 2003, BMC began experiencing a period of operating losses and severe financial decline resulting primarily from reductions in its Medicare and Charity Care reimbursement.

27.    However, the Trustee and Officer Defendants recklessly failed to address BMC's deteriorating financial condition.  Further, Evans recklessly misrepresented BMC's financial condition to, among others, the BMC Board and the New Jersey Health Care Facilities Financing Authority ("NJHCFFA").  These actions allowed BMC to continue operating unprofitably, thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for bankruptcy in April 2007.

28.    The Trustee Defendants acted with gross negligence and reckless disregard in failing to discover Evans' dereliction of his duties and reckless misrepresentation of BMC's financial condition which allowed BMC to continue operating unprofitably, thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for bankruptcy in April 2007.

29.    Moreover, throughout 2005 and 2006, The Trustee and Officer Defendants approved various ill-conceived and doomed initiatives and proposed transactions that contributed to the loss of BMC's net assets and deepened its insolvency.

30.    For 2005-2006, BMC's Board leadership was as follows:  Chairman Brockman; Vice Chairman Garelick; Treasurer Campbell; Secretary Mill; and BMC's CEO and President Evans.

31.    The Board's Executive Committee for 2005-2006 consisted of the foregoing five defendants (Brockman, Garelick, Campbell, Mill and Evans), as well as defendants Finnerty and Levine.

32.    The Board's Finance Committee for 2005-2006 was chaired by defendant Campbell, and also included defendants Evans, Finnerty, Garelick, Levine, and Mills.

33.    The Board's Audit Committee for 2005-2006 was chaired by defendant Finnerty, and also included defendants Evans, Garelick, Ward, and Wozniak.

34.    In 2006, WS+B performed an audit of the consolidated financial statements of BMC and its affiliate, BMC Foundation, as of December 31, 2005, purportedly in accordance with Generally Accepted Auditing Standards ("GAAS").

35.    WS+B issued an unqualified audit report dated February 22, 2006, opining that BMC's financial statements fairly presented its consolidated financial position in accordance with Generally Accepted Accounting Principles ("GAAP").

36.    In performing the audit and issuing its report, WS+B deviated from GAAS and negligently failed to discover that BMC's financial statements did not fairly represent BMC's financial condition in accordance with GAAP.

37.    WS+B's deviation from GAAS and its issuance of the unqualified audit report allowed BMC to continue operating in violation of its bond covenants and continue operating unprofitably, thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for bankruptcy in April 2007.

38.    The actions of these Defendants caused damages to BMC for which the Defendants are liable.

### B.   BMC's Bond Covenants:

39.     BMC had outstanding debt in the form of long term tax exempt bonds that had been issued on its behalf by the New Jersey Health Care Facilities Financing Authority ("NJHCFFA") in 1994 and 1998 (the "NJHCFFA Bonds").

40.     The loan agreement for the NJHCFFA Bonds (the "Loan Agreement") contained as covenants that BMC maintain and report quarterly certain financial ratios (the "Covenants"), including maintaining a debt service coverage ratio ("DSC Ratio") of at least 1.25.

41.     In general, this DSC Ratio Covenant meant that BMC had to have sufficient cash flows available to cover the principal and interest payments on the NJHCFFA Bonds and other debt 1.25 times (or by a margin of 125 percent).

42.     The Loan Agreement provided that the DSC Ratio would be tested at the end of each fiscal quarter based on BMC's audited annual financial statements and unaudited, quarterly financial statements.

43.     Thus, BMC was required to prepare and deliver to NJHCFFA unaudited financial statements prepared on a quarterly basis and audited financial statements for the preceding fiscal year prepared in accordance with GAAP.

44.     Further, the Loan Agreement required that a BMC officer certify the accuracy of the DSC Ratio calculation and the accuracy and completeness of the financial statements delivered to NJHCFFA.

45.     Upon information and belief, pursuant to these requirements, BMC prepared and submitted unaudited quarterly financial statements, caused audited financial statements to be prepared on an annual basis, and certified the accuracy of the DSC Ratio calculations and the accuracy and completeness of its financial statements.

46.    Pursuant to Section 6.4 of the Loan Agreement for the NJHCFFA Bonds, if the DSC Ratio fell below 1.25 for any quarter, BMC was required to retain a consultant (as defined in the Agreement) acceptable to NJHCFFA who would prepare a report recommending changes that the consultant believed should be implemented with respect to BMC's operation and management.

47.    If BMC's DSC Ratio failed to meet the 1.25 threshold, BMC's Board was required by this section of the Loan Agreement to accept the consultant's report and take steps to implement the report's recommendations.

48.    Moreover, pursuant to Section 7.1(A)(ix) of the Loan Agreement, an "Event of Default" included "[i]f any representation or warranty, made by [BMC] pursuant to or in connection with th[e] Loan Agreement or any report, certificate, financial statement, application, or other instrument or document furnished by [BMC] shall prove to be false or misleading in any material respect when made."

49.    Pursuant to Section 7.2 of the Loan Agreement, in the Event of Default NJHCFFA was allowed to declare that the remaining principal of the NJHCFFA Bonds, and the interest accrued thereon, was immediately due and payable by BMC, subject to a cure period.

**C.    Overview of BMC's Financial Demise:**

50.    Prior to January 2004, BMC's CEO and President Evans reported each month to BMC's Board that BMC was operating profitably, ultimately claiming thirty-two straight months of profitable operation through December 2003.

51.    This claimed profitability streak came to an end in January 2004 as BMC reported a $2 million operating loss for that month.

52.     The change in BMC's fortunes appears to be primarily the result of an estimated $10 million reduction in Medicare and Charity Care reimbursement in 2003, followed by an $18 million reduction in 2004, as well as a declining patient census.

53.     However, the onset of BMC's financial problems was known to its Board of Trustees because the Board was informed of the projected $10 million reduction in Medicare and Charity Care reimbursement for 2003 at its February 6, 2003 meeting, and of the projected $18 million reduction for such reimbursement for 2004 at its December 4, 2003 meeting.

54.     Thus, at the January 2004 Board Meeting, Trustee and Treasurer Campbell reported that "we are about to encounter a period of cash flow shortage and losses," and BMC's budget included a projected $7.1 million loss for 2004.

55.     In January 2004, the Board adopted a "Turnaround Plan" with certain cost reductions purportedly saving $1 million to $1.5 million per month in 2004.

56.     At the Board's September 2, 2004 meeting, BMC's Chief Financial Officer, Heather Aaron ("Aaron") informed the Board that BMC's losses of $1.2 million for the year-to-date were $3 million better than the budget forecast which projected a $7.1 million loss for the year.

57.     Due in part to the reckless failure of the Trustee and Officer Defendants to take sufficient efforts to prevent BMC's continual decline, BMC continued to run monthly operating deficits which made it increasingly difficult to meet the quarterly DSC Ratio of 1.25 required by the NJHCFFA Bond Covenants.

58.     However, upon information and belief, the Trustee and Officer Defendants recklessly and grossly negligently failed to take adequate action in 2005 and 2006 to address BMC's declining revenues and increasing operating deficits.

59.    By September 2005, BMC's reported DSC Ratio had fallen to 1.25.

60.    On information and belief, operating losses in the 4th quarter of 2005 would have caused the DSC Ratio to fall below 1.25 and cause BMC to violate its Bond Covenant that required BMC to maintain a DSC Ratio equal to or greater than 1.25.

61.    However, the Trustee and Officer Defendants recklessly misrepresented BMC's actual DSC Ratio after September 2005 primarily as a result of a questionable $5 million pledge made by Omni Asset Management in October 2005, as well as overstating patient accounts receivable and other receivables and understating bad debt reserves regarding the patient accounts receivable.

### D.    Evans Recklessly Concealed BMC's Worsening Financial Condition and Ultimate Insolvency and the Trustee Defendants Were Grossly Negligent and Reckless in Failing to Supervise Evans and Discover His Misconduct:

62.    Upon information and belief, BMC's President and CEO Evans misrepresented BMC's financial condition to its Board until after he had received a large bonus in November 2006 that was dependent, in part, on BMC complying with its NJHCFFA Bond Covenants, including the DSC Ratio Covenant.

63.    Evans left BMC in November 2006 after receiving a $200,000 bonus that was tied, in part, to BMC meeting its NJHCFFA Bond Covenants.

64.    Upon information and belief, the monthly financial information that Evans provided to the Board and NJHCFFA in 2005 and 2006 was materially false.

65.    Upon information and belief, the Trustee Defendants had little understanding or experience regarding proper hospital accounting, and recklessly and/or grossly negligently performed their duties by failing to discover BMC's true financial condition.

66.    Upon information and belief, BMC's deteriorating financial condition in 2005 and 2006 was recklessly misrepresented by Evans through at least three methods.

(a)    The October 2005 $5 Million Pledge

67.    In October 2005, Evans allegedly obtained a $5 million pledge to the Foundation from Omni Asset Management ("Omni") (the "Pledge"), one of three suitors seeking to purchase certain real property (the "Bell Building") from BMC for the purpose of building a skilled nursing facility.

68.    The Pledge states that it was payable in five annual $1 million installments commencing in June 2006.

69.    Approximately the full $5 million Pledge amount was included by BMC as an unrestricted asset on BMC's 2005 balance sheet.

70.    However, the Trustee and Officer Defendants knew or should have known that the Pledge was uncollectable and should not have been included as an asset in BMC's financial statements.

71.    Omni made a $1 million payment to BMC in June 2006 seemingly in accordance with the Pledge.

72.    However, in December 2006, after Evans had resigned, Omni produced a $1 million promissory note from BMC bearing Evans' purported signature as well as the signature of Chairman of the Board Brockman.

73.    Notwithstanding that: (i) Brockman claimed his signature on the note was forged, (ii) Brockman claimed that he had no prior knowledge of the $1 million "loan;" and (iii) Brockman claimed to be aware of the Pledge; neither Brockman nor, upon information and belief, any other Board member contacted Evans to confirm that BMC owed the $1 million debt to Omni.

74.    Brockman and the other Trustee Defendants acted grossly negligent and in reckless disregard of his fiduciary duties by agreeing to deduct $1 million from the price Omni was to pay for the purchase of the Bell Building as repayment of the "loan."

75.    Upon information and belief, Omni made no other payment to BMC in fulfillment of the Pledge.

(b)    Patient Accounts Receivable

76.    Upon information and belief, BMC's financial condition was further misrepresented in 2005 and 2006 by overstating patient accounts receivable and understating the bad debt reserve for such patient accounts receivable.

77.    In 2004, the total receivable for patient accounts was $19.7 million net of a bad debt reserve of $10.5 million.

78.    In 2005, the total patient receivable had grown to $26.3 million net of a bad debt reserve of only $10.6 million.  More than half of the receivable was due from Medicare.

79.    BMC's methodology for accruing income on patient accounts receivable was outdated, factually inaccurate, and not in accordance with GAAP.

80.    Upon information and belief, of the remaining $23.3 million patient accounts receivable at year end 2006, $11.9 million was ultimately written off by BMC.

(c)    Other Receivables

81.    Upon information and belief, there is also a material overstatement of "other receivables" included in BMC's quarterly and annual financial statements for 2006.

82.    A receivable from St. Vincent's Hospital in Staten Island ("St. Vincent's) of $3.1 million was set up in 2006 purportedly for organizational costs incurred in the attempted (ultimately unsuccessful) acquisition of St. Vincent's, which was itself bankrupt.

13

83.    Upon information and belief, these expenses were reported as assets in BMC's monthly, quarterly and annual financial statements, thereby materially overstating BMC's income and net assets. Between April and August 2006, this receivable inexplicably grew to $28.5 million.

    (d)    <u>BMC's Directors' and Officers' Other Grossly Negligent and Reckless Actions</u>

        (i)    *The Misguided Attempt to Purchase St. Vincent's Hospital*

84.    In December 2005, notwithstanding BMC's operating losses and declining financial position, BMC's Board commenced efforts to purchase St. Vincent's, a bankrupt hospital in Staten Island.

85.    In April 2006, the Board approved the proposed acquisition of St. Vincent's, however, the acquisition was never consummated.

86.    The Board's ultimately unsuccessful efforts to purchase St. Vincent's Hospital continued until December 2006 and BMC spent millions of dollars pursuing this fruitless transaction.

        (ii)    *The Failure to Refinance the NJHCFFA Bonds*

87.    In 2005, the Trustee and Officer Defendants knew that BMC could save $1 million by refinancing the NJHCFFA Bonds.

88.    The Trustee and Officer Defendants recklessly and grossly negligently failed to refinance the NJHCFFA Bonds, in a fruitless effort that lasted approximately eighteen months, causing BMC to lose the opportunity to save $1 million.

        (iii)    *Trustee Campbell and His Conflict of Interest Regarding Pamrapo Bank*

89.    In early 2004, BMC obtained a $2 million credit line from Pamrapo Savings Bank S.L.A. ("Pamrapo Bank") to cover overdrafts and pay its operating expenses.

90.     At this time, BMC's Trustee and Board Treasurer Campbell was also the Chairman of Pamrapo Bank's Board of Directors.

91.     In May 2006, BMC made a request to Pamrapo Bank for an increase in its credit line from $2 million to $5 million, however, Pamrapo Bank agreed to increase the line to only $3 million.

92.     In November 2006, BMC defaulted on its line of credit with Pamrapo Bank and on December 8, 2006 the Trustee Defendants gave Pamrapo Bank a $1.9 million mortgage on BMC's real estate to secure repayment of the remainder of the line of credit.

(iv)    *BMC's Overbilling of Third Party Payers*

93.     On information and belief, BMC overstated its revenues and assets over several years by recklessly and/or negligently overbilling Medicare and New Jersey Horizon Blue Cross/Blue Shield ("BCBS") for services rendered to patients insured by such third party payers.

94.     Among the ways in which BMC overbilled Medicare was by excessive billing of "outlier cases," *i.e.,* inflating charges for inpatient and outpatient care to make these cases appear more costly than they actually were, and thereby obtaining outlier payments from Medicare – supplemental reimbursement from Medicare for cases where the cost of care is unusually high – that BMC was not entitled to receive.

95.     As a result of the overbilling, Medicare and BCBS asserted claims against BMC to recoup excessive amounts paid on account of such overbilling.

96.     In June 2006 BMC announced a $2.1 million settlement with Horizon Blue Cross/Blue Shield regarding overbilling claims, which settlement required BMC to make monthly payments of $262,000 commencing on November 1, 2006

97.    On October 23, 2006, BMC entered into a $3.5 million settlement with Medicare of overbilling claims that required BMC to make monthly payments of $156,000 beginning on October 28, 2006.

98.    BMC reported a massive October 2006 operating deficit of $16 million that eliminated any prospect of refinancing its bonds.

99.    Evans abruptly left BMC at the end of November 2006 by giving approximately three weeks' notice, and after his departure BMC's ruined financial condition was disclosed.

100.    At the December 7, 2006 Board meeting, Chairman Brockman reported that in addition to the staggering October deficit, BMC was running a monthly operating deficit of $1.2 million.  Brockman also admitted that the bond refinancing was no longer possible and that BMC "may no longer be able to recover."

101.    BMC ultimately reported a 2006 loss of $21 million and filed for bankruptcy on April 16, 2007.

**E.    The WS+B Audit of BMC's 2005 Consolidated Financial Statements:**

102.    WS+B audited BMC's 2005 consolidated financial statements (the "2005 Financial Statements") and issued an unqualified audit report thereon dated as of February 22, 2006.

103.    As described above herein, BMC's 2005 Financial Statements did not present fairly in all material respects BMC's consolidated financial position in accordance with GAAP because they were materially false for at least the following reasons: (i) they included as revenue and unrestricted assets, the present value of the Pledge; and (ii) included a substantial amount of aged and uncollectable patient accounts receivable as assets while simultaneously included an improperly reduced reserve for uncollectable patient accounts receivable.

104.    As the auditors of the 2005 Financial Statements, WS+B was required to comply with GAAS in performing and completing the audit and issuing its report.

105.    Although BMC's management prepared the 2005 Financial Statements, it was WS+B's responsibility "to express an opinion on these consolidated financial statements based on our audit" as stated in WS+B's Independent Auditors' Report dated as of February 22, 2006 (the "Report").

106.    According to WS+B's Report, WS+B's audit examination was conducted in accordance with GAAS and it was WS+B's opinion that the 2005 Financial Statements fairly presented the consolidated financial condition of BMC in all material respects.

107.    However, WS+B should have known that the 2005 Financial Statements did not fairly present the consolidated financial condition of BMC in all material respects because, among other things, the Pledge should not have been recognized as revenue or an unrestricted asset.

108.    As the independent auditor of BMC's 2005 Financial Statements, WS+B was required to review the documents evidencing the Pledge, to determine the terms and conditions of the Pledge and its collectability, and to confirm BMC's accounting for the Pledge in its financial statements in accordance with GAAP.

109.    An independent auditor performing these tasks in accordance with GAAS would have determined that the Pledge was uncollectable and should not have been included as revenue or an unrestricted asset in BMC's quarterly and annual 2005 Financial Statements.

110.    WS+B deviated from GAAS by, among other things, failing to consider the collectability of the Pledge and whether BMC had made adequate provision for a reserve regarding the Pledge.

111.    Further, WS+B was required by GAAS to undertake an analysis to ascertain the net realizable value of BMC's patient accounts receivable, as well as the reasonableness of the reserves for uncollectible patient accounts receivable and the provision for losses from such receivables.

112.    Therefore, if WS+B had performed its audit in accordance with GAAS, WS+B would have determined that the patient accounts receivable and related reserve in BMC's 2005 Financial Statements were not in accordance with GAAP or the practices of other New Jersey acute care hospitals, and were therefore, improper.

113.    Had WS+B performed its audit in accordance with GAAS, WS+B would have identified that BMC was in violation of its DSC Ratio Covenant as of December 31, 2005 and that BMC's 2005 Financial Statements did not present fairly in all material respects BMC's consolidated financial position in accordance with GAAP.

114.    In light of these facts, including BMC's ongoing operating deficits, had WS+B performed its audit services properly in accordance with GAAS, WS+B would have discovered that BMC was in violation of, at least, the Covenant regarding the DSC Ratio.

115.    WS+B would have then been required to report this violation to BMC and its Board, which would have required BMC to report the violation to NJHCFFA and hire a consultant in accordance with Section 6.4 of the Loan Agreement.

116.    Had WS+B conducted its audit in accordance with GAAS, BMC's December 31, 2005 filing with NJHCFFA would have been exposed as false in regard to the DSC Ratio, which would have constituted an Event of Default under the Loan Agreement and possibly triggered acceleration of the payment of the NJHCFFA Bonds.

117.    WS+B's failure, in early 2006, to determine the DSC Ratio violation, identify the materially false and misleading nature of BMC's 2005 Financial Statements and identify BMC's failing financial condition allowed BMC to continue operating unprofitably, thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for bankruptcy in April 2007.

## COUNT I

### Grossly Negligent and Reckless Misrepresentation
(As to Defendant Evans)

118.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

119.    Evans made misrepresentations and omissions of past and present facts regarding BMC's financial condition and operations as alleged more fully herein above with reckless and careless disregard for the truth of such statements and omissions of facts.

120.    Evans knew or should have known that BMC was operating at a loss, suffering a severely declining financial position, and was in violation of the NJHCFFA Bond Covenant regarding the DSC Ratio, as of December 31, 2005.

121.    Evans intended that the Board and NJHCFFA rely on the statements contained in BMC's 2005 financial reports to the Board and NJHCFFA and in BMC's 2005 Financial Statements.

122.    Evans knew that the statements, made with reckless and careless disregard for their truth, would likely conceal BMC's true financial condition and convince the Board and NJHCFFA to allow BMC to continue operating and accruing losses, in part, so that Evans could obtain a significant bonus in 2006.

123.    Evans knew that BMC's creditors, including NJHCFFA, would reasonably rely upon BMC's pronouncements of financial viability in providing loans to BMC, and not pursuing contractual remedies under the bond loan agreements and indentures.

124.    Evans' statements, made with reckless and careless disregard for their truth, allowed BMC to continue operating unprofitably, thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for bankruptcy in April 2007.

## COUNT II

## BREACH OF FIDUCIARY DUTY
(As to Defendant Evans)

125.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

126.    At all times during the events set forth herein above until he left BMC in November 2006, Evans was a member of the Board of Trustees of BMC.

127.    By making the false and/or reckless statements and grossly negligent and/or reckless actions described herein, Evans failed to exercise the degree of diligence, care and skill which an ordinarily prudent person would exercise under similar circumstances in the like position.

128.    Evans' failure to exercise such diligence, care and skill was made in bad faith, in part, in order so that he would receive a significant bonus in 2006.

129.    Evans' failure to exercise such diligence, care and skill caused BMC damage by, among other things, allowing it to continue operating unprofitably, thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for bankruptcy in April 2007.

## COUNT III

### FRAUDULENT TRANSFER – CONSTRUCTIVE FRAUD
(As to Defendant Evans)

130.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

131.    This count seeks to recover the $200,000 bonus paid by BMC to Evans in or about November 2006 (the "Evans Bonus") because the payment of such bonus constituted a fraudulent transfer under the Bankruptcy Code.

132.    Evans misrepresented BMC's financial condition to its Board, including BMC's compliance with its NJHCFFA Bond Covenants.

133.    BMC received less than reasonably equivalent value in exchange for paying the Evans Bonus.

134.    BMC was insolvent on the date that it paid the Evans Bonus.

135.    The Evans Bonus is avoidable pursuant to Section 548(a) of the Bankruptcy Code and the amount of the Evans Bonus is recoverable from Evans pursuant to Section 550 of the Bankruptcy Code.

## COUNT IV

### FRAUDULENT TRANSFER – CONSTRUCTIVE FRAUD
(As to Defendant Evans)

136.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

137.    This count seeks to recover the $200,000 bonus paid by BMC to Evans in or about November 2006 (the "Evans Bonus") because the payment of such bonus constituted a fraudulent transfer under the Bankruptcy Code.

138.    Evans misrepresented BMC's financial condition to its Board, including BMC's compliance with its NJHCFFA Bond Covenants.

139.   BMC received less than reasonably equivalent value in exchange for paying the Evans Bonus.

140.   BMC was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

141.   The Evans Bonus is avoidable pursuant to Section 548(a) of the Bankruptcy Code and the amount of the Evans Bonus is recoverable from Evans pursuant to Section 550 of the Bankruptcy Code.

## COUNT V

### FRAUDULENT TRANSFER – CONSTRUCTIVE FRAUD
(As to Defendant Evans)

142.   Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

143.   This count seeks to recover the $200,000 bonus paid by BMC to Evans in or about November 2006 (the "Evans Bonus") because the payment of such bonus constituted a fraudulent transfer under the Bankruptcy Code.

144.   Evans misrepresented BMC's financial condition to its Board, including BMC's compliance with its NJHCFFA Bond Covenants.

145.   BMC received less than reasonably equivalent value in exchange for paying the Evans Bonus.

146.   At the time the Evans Bonus was paid, Evans was an insider of the Debtor.

147.   BMC paid the Evans Bonus to or for the benefit of Evans under an employment contract.

148.   The payment of the Evans Bonus was not in the ordinary course of BMC's business.

149.    The Evans Bonus is avoidable pursuant to Section 548(a) of the Bankruptcy Code and the amount of the Evans Bonus is recoverable from Evans pursuant to Section 550 of the Bankruptcy Code.

## COUNT VI

### FRAUDULENT TRANSFER – N.J.S.A. 25:2-27
(As to Defendant Evans)

150.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

151.    This count seeks to recover the $200,000 bonus paid by BMC to Evans in or about November 2006 (the "Evans Bonus") because the payment of such bonus constituted a fraudulent transfer under New Jersey law.

152.    There exists at least one creditor with a claim against BMC that claim arose before the Evans Bonus was paid.

153.    At the time the Evans Bonus was paid, Evans was an insider of the Debtor.

154.    BMC was insolvent on the date that it paid the Evans Bonus.

155.    Evans had reasonable cause to believe that BMC was insolvent at the time the Evans Bonus was paid.

156.    The Evans Bonus is avoidable pursuant to N.J.S.A. 25:2-27, and the amount of the Evans Bonus is recoverable from Evans pursuant to Section 544 and 550 of the Bankruptcy Code.

## COUNT VII

### UNJUST ENRICHMENT
(As to Defendant Evans)

157.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

158.    Evans' retention of the Evans Bonus is unjust because Evans' grossly negligent and reckless actions concealed the fact that BMC's financial condition was such that Evans was not entitled to the payment of the Evans Bonus.

159.    Therefore, Evans has been unjustly enriched by the payment of the Evans Bonus and the Evans Bonus must be repaid to BMC by Evans.

## COUNT VIII

### BREACH OF DIRECTOR'S FIDUCIARY DUTY - SUPERVISION
(As to Defendants Brockman, Garelick, Campbell, Mill, Finnerty, Levine, Ward & Wozniak)

160.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

161.    During the time period of the events set forth herein above, Defendants Brockman, Garelick, Campbell, Mill, Finnerty, Levine, Ward & Wozniak (collectively, the "Control Group") were members of the Board of Trustees of BMC and sat on the Board's Executive, Finance, and Audit Committees for 2005-2006 as described above.

162.    The individuals of the Control Group grossly negligently and/or recklessly failed to exercise the required degree of diligence, care and skill in supervising Evans, Aaron and BMC's other management officials, as well as WS+B's audit of BMC's 2005 Financial Statements, which an ordinarily prudent person would exercise under similar circumstances in the like position.

163.    The actions approved by the Board and the Board's failure to discover and stop the false and misleading nature of BMC's 2005 Financial Statements allowed BMC's affairs to be undertaken in a grossly negligent, reckless and unconscionable manner that included intrinsically unfair transactions with Omni and Pamrapo Bank, which represented self-dealing given the involvement of various members of the Control Group with Omni and Pamrapo Bank.

164.    The Control Group's gross negligently and/or reckless failure to exercise such diligence, care and skill in supervising Evans, Aaron and the other BMC management officials caused BMC damage by, among other things, allowing it to continue operating unprofitably, thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for bankruptcy in April 2007.

## COUNT IX

## BREACH OF DIRECTOR'S FIDUCIARY DUTY – FAILURE TO PROTECT CORPORATE ASSETS
(As to Defendants Brockman, Garelick, Campbell, Mill, Finnerty, Levine, Ward & Wozniak)

165.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

166.    The individuals of the Control Group were aware as early as February 2003 that BMC was experiencing a reduction in projected revenue, and therefore, would experience cash flow problems and losses throughout 2004, 2005 and 2006 that would put it in danger of violating BMC's NJHCFFA Bond Covenant obligations.

167.    However, even as BMC incurred increasing settlement payment obligations during these years, the Control Group grossly negligently and/or recklessly failed to exercise the required degree of diligence, care and skill in developing and implementing cost saving initiatives and revenue enhancement projects to address BMC's liquidity problems, which an ordinarily prudent person would exercise under similar circumstances in the like position.

168.    The Control Group's grossly negligent and/or reckless failure to develop and implement such necessary initiatives and projects represented a wasting of BMC's corporate assets that led to its ultimate insolvency.

169.    The Control Group's gross negligence and/or reckless failure to exercise such diligence, care and skill in addressing BMC's liquidity problems caused BMC damage by, among other things, allowing it to continue operating unprofitably, thereby causing it to lose its

25

remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for

bankruptcy in April 2007.

## COUNT X

## BREACH OF DIRECTOR'S FIDUCIARY DUTY – WASTE OF CORPORATE ASSETS
(As to Defendants Brockman, Garelick, Campbell, Mill, Finnerty, Levine, Ward & Wozniak)

170.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

171.    The individuals of the Control Group were aware as early as February 2003 that

BMC was experiencing a reduction in projected revenue, and therefore, would experience cash

flow problems and losses throughout 2004, 2005 and 2006 that would put it in danger of

violating BMC's NJHCFFA Bond Covenant obligations.

172.    However, even as BMC incurred increasing settlement payment obligations

during these years, the Control Group grossly negligently and/or recklessly failed to exercise the

required degree of diligence, care and skill which an ordinarily prudent person would exercise

under similar circumstances in the like position by wasting corporate assets.

173.    The Control Group's wasting of BMC's corporate assets included, but are not

limited to, the failed purchase of St. Vincent's, the failed attempt to refinance BMC's NJHCFFA

Bonds, and the improper insider dealings with Pamrapo Bank, that led to its ultimate insolvency.

174.    The Control Group's gross negligence and/or reckless wasting of BMC's assets

caused BMC damage by, among other things, allowing it to continue operating unprofitably,

thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until

BMC finally filed for bankruptcy in April 2007.

## COUNT XI

## ACCOUNTANT MALPRACTICE
(As to DefendantWS+B)

175.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

176.    WS+B had a duty to audit and report on BMC's financial statements in accordance with GAAS.

177.    WS+B failed to exercise reasonable care, skill, diligence or knowledge, as required by GAAS, in performing its audit of BMC's 2005 Financial Statements and preparing its audit report, which an independent auditor in good standing in similar communities would have exercised.

178.    WS+B's failure to exercise such reasonable care, skill, diligence or knowledge caused it to fail to discover that BMC's 2005 Financial Statements did not present fairly in all material respects BMC's consolidated financial position in accordance with GAAP due to the uncollectible nature of the Pledge and BMC's inclusion of the Pledge in its revenues and unrestricted assets, as well as BMC's false and misleading overstatement of patient accounts receivable and other receivables, and understatement of bad debt reserves for the patient accounts receivable.

179.    WS+B's failure to exercise such diligence, care and skill in auditing BMC's 2005 Financial Statements caused BMC damage by, among other things, allowing it to continue operating unprofitably, thereby causing it to lose its remaining net assets, go insolvent, and deepen its insolvency until BMC finally filed for bankruptcy in April 2007.

## COUNT XII

### AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFER
(As to Defendant WS+B)

180.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

181.    Within ninety (90) days prior to the Petition Date (the "Preference Period"), BMC made one or more transfers to Defendant WS+B, as set forth on the schedule attached hereto ("Attachment A").

182.    Attachment A reflects Plaintiff's current knowledge of the transfers made to Defendant WS+B during the Preference Period.

183.    During the course of this adversary proceeding, Plaintiff may learn, through discovery or otherwise, of additional transfers made to Defendant WS+B during the Preference Period.  It is Plaintiff's intention to avoid and recover all such transfers, whether such transfers presently are reflected on Attachment A or not.

184.    Collectively, all transfers made by BMC of an interest of the Debtor in property to or for the benefit of Defendant WS+B during the Preference Period (whether such transfers are presently reflected on Attachment A or not) are referred to herein as "the WS+B Transfers."

185.    The WS+B Transfers that BMC made to Defendant WS+B constitute transfers of interest of the Debtor in property:

(a)    to or for the benefit of a creditor;

(b)    for or on account of an antecedent debt owed by the Debtor before the transfers were made; and

(c)    made while the Debtor was insolvent.

186.    The WS+B Transfers enabled Defendant WS+B to receive more than it would have received if the case were a case under Chapter 7 of the Bankruptcy Code, the transfers had not been made, and Defendant WS+B had received payment of such debt to the extent provided by Title 11.

187.    Upon information and belief, Defendant WS+B was the initial transferee of the WS+B Transfers, the person for whose benefit the WS+B Transfers were made, or the immediate or mediate transferee of such initial transferee.

188.    By reason of the foregoing, Plaintiff may avoid the WS+B Transfers that Debtor made to Defendant pursuant to 11 U.S.C. § 547(b) and recover the value of the WS+B Transfers pursuant to 11 U.S.C. § 550.

## COUNT XIII

## ATTORNEYS FEES AND COSTS

189.    Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

190.    By reason of the foregoing and pursuant to Fed. R. Bankr. P. 7008(b), Plaintiff is entitled to recover their reasonable costs and legal fees incurred in connection with this proceeding.

**WHEREFORE,** Plaintiff requests the entry of judgment against the Defendants as follows:

(a)    Compensatory and consequential damages against Defendant Evans in an amount to be determined at trial arising from Defendant Evans' grossly negligent and/or reckless actions, and breach of duty to BMC;

(b)    Punitive damages against Defendant Evans due to Defendant Evans' grossly negligent and/or reckless actions, and breach of duty to BMC;

(c)    Avoiding the Evans Bonus;

(d)    Directing Defendant Evans to pay Plaintiff at least the sum of the Evans Bonus, plus interest at the legal rate from the date of filing of this Complaint, and ordering Defendant Evans to immediately pay the judgment to Plaintiff;

(e)    Compensatory and consequential damages, jointly and severally, against the members of the Control Group in an amount to be determined at trial arising from the Control Group's gross and/or reckless breaches of their duty to BMC;

(f)      Punitive damages against the members of the Control Group due to the Control

Group's gross and/or reckless breaches of their duty to BMC;

(g)      Compensatory and consequential damages against Defendant WS+B in an amount

to be determined at trial arising from Defendant WS+B's failure to exercise the required standard

of care in performing the audit of BMC's 2005 Financial Statements;

(h)      Punitive damages against Defendant WS+B due to Defendant WS+B's failure to

exercise the required standard of care in performing the audit of BMC's 2005 Financial

Statements;

(i)      Avoiding the WS+B Transfers;

(j)      Directing Defendant WS+B to pay Plaintiff at least the sum of the WS+B

Transfers, plus interest at the legal rate from the date of filing of this Complaint, and ordering

Defendant WS+B to immediately pay the judgment to Plaintiff;

(k)      Awarding post-judgment interest to Plaintiff until the entire amount of the

respective judgments are paid by the Defendants;

(l)      Awarding Plaintiff its costs, fees (including attorneys' fees) and expenses

associated with prosecution of this adversary proceeding; and

(m)      Granting such other and further relief as the Court deems just and equitable.


SILLS CUMMIS & GROSS, P.C.
*Attorneys for Plaintiff, Official Committee of*
*Unsecured Creditors of Bayonne Medical Center*


Dated: April 15, 2009          By: _____/s/_____
                                        Philip R. White
                                        Thomas S. Novak
                                        Scott B. Murray
                                        Boris I. Mankovetskiy